RECEIVED-CLERK
U.S. DISTRICT COURT

2004 FEB 17  A 11: 13

Kingdon Kase, Senior Trial Counsel
U.S. SECURITIES AND EXCHANGE COMMISSION
Mellon Independence Center, Suite 2000
701 Market Street
Philadelphia, PA 19106
Telephone: (215) 597-3100
Fax: (215) 597-2740
KK-1007

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Mellon Independence Center<br>701 Market Street, Suite 2000<br>Philadelphia, Pennsylvania 19106-1538<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>DEAN A. NICHOLS<br>751 Ridgewood Road<br>Millburn, New Jersey 07041<br><br>　　　　　　　　　　Defendant. | Hon. *HAROLD A. ACKERMAN*<br><br>Civil Action No. *04-CV-641* |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges that:

### SUMMARY

1. This matter involves a fraudulent course of conduct by Dean A. Nichols ("Nichols"), a certified public accountant and a senior manager at a subsidiary of a large public company, Performance Food Group Company ("PFG"). During 2000 and 2001, Nichols made numerous improper accounting journal entries on the books of AFI Foodservice Distributor, Inc. ("AFI"), a subsidiary of PFG. As a result of Nichols' conduct, PFG filed with the Commission materially misleading financial statements in its quarterly reports for several reporting periods throughout 2000 and 2001.

2. Specifically, Nichols caused PFG to overstate its net income by a total of $3.8 million in certain quarterly reports filed during 2001 and 2002 by failing to reconcile properly imbalances in various AFI accounts, and by making improper accounting adjustments in an effort to make the accounts appear to balance. Because AFI's accounts were consolidated with PFG's, Nichols' actions caused PFG to overstate materially its reported net earnings for the quarters ended June 30, 2000, September 30, 2000, March 31, 2001 and September 30, 2001.

3. As a result of the conduct alleged in this Complaint, Nichols violated Sections 10(b) and 13(b)(5) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Exchange Act Rules 10b-5 and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1, and aided and abetted PFG's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act, 17 C.F.R. §§ 78m(a) and 78m(b)(2)(A), and Rules 12b-20 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20 and 240.13a-13. Unless he is enjoined, Nichols is likely to commit and to aid and abet such violations in the future.

## JURISDICTION

4. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(e) and 21(d) of the Exchange Act, 15 U.S.C. §§ 78t(e) and 78u(d), to enjoin defendant from engaging in, and from aiding and abetting, the acts, practices and courses of business alleged in this Complaint, to obtain disgorgement of any amounts by which defendant was unjustly enriched by such conduct, to obtain civil penalties, and for other appropriate relief.

5. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

6. Certain of the acts, practices and courses of business constituting the violations alleged herein occurred within the District of New Jersey and elsewhere, and were effected, directly or indirectly, by making use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANT AND OTHER RELEVANT PERSONS AND ENTITIES

7. Defendant Nichols, age 44, resides in Millburn, New Jersey. From January 2001 to March 2002, Nichols was an executive vice-president of AFI and, from May 1995 to December 2000, served as its controller. Nichols is also a certified public accountant.

8. Performance Food Group Company, a publicly held Tennessee corporation with its principal office in Richmond, Virginia, markets, processes and sells food and food-related products to restaurants, hotels, schools and other businesses and institutions. PFG's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on the NASDAQ using the symbol "PFGC."

9. AFI Foodservice Distributor, Inc., located in Elizabeth, New Jersey, is a subsidiary of PFG that provides food distribution services to restaurants, healthcare facilities, schools and other businesses and institutions.

## FACTS

### Nichols' Role at AFI

10. In 2000 and 2001, Nichols was responsible for AFI's financial and accounting functions either in a primary or supervisory capacity.

11. In 2000, as AFI's controller, Nichols managed approximately nine people, including staff accountants and accounts payable personnel, and was responsible for preparing AFI's financial statements. Nichols reported directly to AFI's president, and operated essentially as AFI's chief financial officer.

12. In late 2000, Nichols was promoted to executive vice-president at AFI, which led to the hiring of Vito Cantatore ("Cantatore") as AFI's controller in April 2001. For several months thereafter, Nichols continued to be active in the day-to-day functions of the controller while Cantatore became proficient in AFI's systems and procedures.

13. Beginning in or around June 2001, Nichols turned the controller duties over to Cantatore completely and assumed a more remote supervisory role, which included a monthly review of AFI's financial statements prior to their submission to PFG.

### Nichols' Fraudulent Accounting

14. PFG and its subsidiaries, including AFI, manage the ordering, receiving, warehousing and delivery of their products through a computerized inventory control system that PFG installed at AFI shortly after it was acquired in October 1997. This system also records sales, billing and inventory information. The subsidiaries utilize the system in reporting their financial data to PFG's headquarters, which, in turn, relies on that data to prepare its financial reports.

15. Beginning in 2000, Nichols discovered that certain of AFI's financial accounts did not balance. Rather than doing the manual reconciliations and calculations necessary to resolve the problems, Nichols simply made, or directed others to make, arbitrary adjusting entries into the inventory control system to produce balanced figures.

16. Nichols made no attempt to determine whether the adjusting entries were appropriate or what effect they would have on AFI's internal accounting records and financial reporting.

17. Nichols failed to advise his superiors or the accounting staff at PFG about the imbalances or the adjusting entries he made to compensate for them.

18. Nichols' improper adjusting entries created inaccuracies in both AFI's and PFG's financial and accounting records. Because PFG relied on those records to prepare its financial reports, Nichols' actions caused PFG to overstate its net income by a total of $3.8 million in certain quarterly reports it filed with the Commission during 2000 and 2001. Specifically, during 2000, PFG overstated its quarterly net earnings by 3.3% and 10.6%, respectively, in its Forms 10-Q filed for the second and third quarters of that year. During 2001, PFG overstated quarterly net income in its Forms 10-Q for the first and third quarters by 21% and 14.8% respectively.

19. Nichols knew, or was reckless in not knowing, that making, or causing others to make, the false adjusting journal entries would make PFG's books and records inaccurate, and would cause the Forms 10-Q filed by PFG during the period of the fraud to contain misstatements and omissions of material facts.

20. Nichols' improper adjusting entries concealed account imbalances and other accounting irregularities emanating from three sources: (i) the practice of "deviated pricing," through which AFI offered discounted prices to its largest customers based on rebates AFI received from its suppliers, (ii) inter-company transactions between AFI and its State Hotel subsidiary, and (iii) returned merchandise, all discussed below.

*Deviated Pricing*

21. AFI engaged in a practice known as "deviated pricing" through which it offered discounts to its largest customers who, by virtue of their size and high volume purchases, could negotiate directly with AFI's suppliers. In such a transaction, AFI billed the customer at the discounted price and received a rebate from its supplier in the amount of the discount.

22. AFI's computerized inventory control system had been installed in March 2000, and, without upgrades, was not able to properly record deviated pricing transactions. The system recorded the rebate receivable in those transactions, but improperly recorded rebate income and did not reduce inventory by a sufficient amount.

23. Although Nichols was not aware that the inventory control system was not properly accounting for deviated pricing transaction, he recognized that AFI's inventory account was overstated. However, rather than doing the manual reconciliations necessary to determine the cause of the problem, Nichols simply adjusted the inventory account each month to compensate for the overstatement and improperly reduced AFI's accounts payable.

24. Nichols' repeated use of these unsupported and improper adjusting journal entries caused AFI materially to overstate its income and understate its liabilities.

25.     Ultimately, the improper adjusting journal entries Nichols made in order to correct account imbalances related to deviated pricing errors caused PFG to overstate its earnings by approximately $2.5 million during 2000 and 2001.

26.     Nichols never notified PFG's management or accounting personnel that AFI's inventory account was overstated or of his improper adjusting entries.

*State Hotel*

27.     On August 31, 1999, AFI acquired State Hotel, a privately owned meat processor based in Newark, New Jersey. State Hotel provided custom-cut meats to restaurants and other food service operations in New York City and the surrounding region. By August 2000, State Hotel's sales and delivery operations had been integrated into AFI. State Hotel's only remaining independent function was to process meats for AFI. From an operating and accounting perspective, AFI bought meat, sold it to State Hotel, which processed it into custom cuts for AFI's customers and sold them back to AFI. AFI tracked the transactions with State Hotel by way of an inter-company account.

28.     Following the acquisition of State Hotel, the inter-company business between it and AFI steadily grew. As the volume of transactions increased, Nichols and his group stopped matching the transfers between AFI and State Hotel. As a result, during 2000 and 2001, the inter-company account used to record transactions between AFI and State Hotel became severely out of balance, ultimately reflecting a discrepancy of several million dollars. While most of the discrepancy represented items that could have been corrected by a proper account reconciliation, approximately $600,000 of the imbalance was due to inventory losses (waste, spoilage, etc.) that should have been expensed during this time period.

29.     Instead of performing the reconciliations necessary to determine the cause of the imbalance in the inter-company account, Nichols made or directed others to make arbitrary adjusting journal entries each month that balanced the inter-company account and created a compensating entry in an accrued liabilities account on the balance sheet. In each successive

6

month, Nichols caused the adjusting entry to be reversed and, at month end, a new adjusting entry to be recorded. As a result, the losses that AFI incurred continued to be suspended in the balance sheet and not recognized as a charge to expenses, as they should have been. Consequently, Nichols' improper adjusting entries concealed the imbalance in the inter-company account and caused AFI and PFG to overstate their earnings.

30. Nichols never notified PFG's management or accounting personnel of his failure to reconcile the State Hotel account or of his improper adjusting entries.

*Returned Merchandise*

31. Approximately $800,000 of the overstatement Nichols caused in PFG's net income during 2000 and 2001 resulted from inaccurate posting of transactions involving returned merchandise.

32. AFI tracked its returned merchandise as follows: Each night when drivers checked in from their routes, an inventory control person accounted for all products returned, both saleable product to be restocked and damaged product to be discarded. This debriefing process was supposed to create entries in the inventory control system: (i) reducing accounts receivable and sales; (ii) increasing the costs for damaged product and, ultimately, cost of goods sold; and (iii) increasing inventory (for returned, but still saleable products).

33. During the relevant time period, the inventory control system incorrectly accounted for AFI's returned merchandise by reducing sales twice, while not increasing inventory and/or the cost of damaged product. This error had the impact of understating sales, inventory and cost of goods sold.

34. Nichols recognized that AFI's sales appeared to be understated. He also knew that the balance for accounts payable on the general ledger did not match the total due to vendors listed in the subsidiary ledger. Nevertheless, Nichols again failed to reconcile accounts payable or to take the steps necessary to determine why sales had been understated. Instead, without

7

seeking guidance from PFG, or informing anyone at the company of his actions, he made arbitrary adjusting journal entries each month to increase sales and reduce accounts payable.

35. Nichols' entries caused an understatement of expenses related to spoiled or damaged goods and suspended these costs on the balance sheet in accounts payable. Consequently, his actions caused AFI's and PFG's financial and accounting records to be inaccurate.

### Nichols' Fraudulent Accounting Causes PFG to Overstate Net Income

36. The errors attributable to Nichols' actions were significant in four of PFG's Form 10-Q's during this two-year period. Specifically, in 2000, PFG overstated net earnings in its: (i) second quarter Form 10-Q by approximately $217,000, or 3.3 percent; and (ii) third quarter Form 10-Q by approximately $799,000, or 11 percent. In 2001, PFG overstated net earnings in its: (i) first quarter Form 10-Q by approximately $1.102 million, or 21 percent; and (ii) third quarter Form 10-Q by approximately $1.666 million, or 14.8 percent. PFG repeated these erroneous figures in press releases announcing its quarterly results.

37. In January 2002, PFG discovered that there were problems in AFI's accounting and commenced an internal investigation.

38. On March 11, 2002, PFG publicly announced that it had identified accounting errors in financial statements of a subsidiary. PFG initially reported that the errors resulted in an overstatement of its net income by $4 million to $5 million during 2000 and 2001.

39. In its Form 10-K for the year ending December 31, 2001, PFG restated its quarterly financial figures for the years 2000 and 2001. PFG has acknowledged that it achieved its previously-reported net income figures due to the irregular accounting practices described herein.

### Nichols' Profits From the Fraud

40. AFI paid Nichols bonuses of $20,839 and $31,000, respectively, in 2000 and 2001, prior to discovering his improper accounting adjustments. All or a substantial portion of

those bonuses were based on whether AFI achieved its goal for operating profit for the year. Had it not been for Nichols' improper accounting adjustments, AFI would not have met its operating profit goals in 2000 and 2001.

### PFG's Failure to File Accurate Reports, and to Make and Keep Required Books and Records

41. PFG's Forms 10-Q for its quarters ended June 30, 2000, September 30, 2000, March 31, 2001 and September 30, 2001 contained false and misleading statements of material facts and included financial statements that inaccurately reported PFG's net earnings. As a result, PFG violated Section 13(a) of the Exchange Act, 17 C.F.R. § 78m(a), and Rules 12b-20 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20 and 240.13a-13. Nichols knowingly or recklessly provided substantial assistance to PFG in committing those violations.

42. From January 2000 through December 2001, PFG failed to make and keep books and records that, in reasonable detail, fairly and accurately reflected PFG's transactions. As a result PFG violated Section 13(b)(2)(A) of the Exchange Act, 17 C.F.R. § 78m(b)(2)(A). Nichols knowingly or recklessly provided substantial assistance to PFG in committing those violations.

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

43. Plaintiff Commission realleges and incorporates by reference herein paragraphs 1 through 42 above.

44. As alleged herein, from at least January 2000 through December 2001, defendant Dean A. Nichols, in connection with the purchase or sale of securities, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange,

    (a)    employed devices, schemes and artifices to defraud;

9

(b) made untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon other persons.

45. By reason of the foregoing, defendant Dean A. Nichols has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder

46. Plaintiff Commission realleges and incorporates by reference herein paragraphs 1 through 45 above.

47. As alleged herein, from January 2000 through December 2001, defendant Dean A. Nichols, knowingly circumvented and knowingly failed to implement a system of accounting controls, and knowingly falsified books, records and accounts required to be maintained by the federal securities laws.

48. By reason of the foregoing, defendant Dean A. Nichols, has violated and, unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1.

## THIRD CLAIM

### Aiding and Abetting Violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder

49. Paragraphs 1 through 48 are realleged and incorporated herein by reference.

50. As alleged herein, from at least January 2000 through December 2001, defendant Dean A. Nichols, aided and abetted PFG in violating federal securities laws requiring it to file with the Commission accurate periodic reports and to maintain accurate books and records.

51. By reason of the foregoing, defendant Dean A. Nichols has aided and abetted, and unless enjoined, will continue to aid and abet violations of Sections 13(a) and 13(b)(2)(A) of the

Exchange Act, 17 C.F.R. §§ 78m(a) and 78m(b)(2)(A), and Rules 12b-20 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20 and 240.13a-13.

WHEREFORE, the Plaintiff Commission respectfully requests that this Court:

### I.

Permanently enjoin defendant Nichols from violating, directly or indirectly, singly or in concert, Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(2)(A), and Exchange Act Rules 10b-5 and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1.

### II.

Permanently enjoin defendant Nichols from, directly or indirectly, singly or in concert, violating or aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act, 17 C.F.R. §§ 78m(a) and 78m(b)(2)(A), and Rules 12b-20 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20 and 240.13a-13.

### III.

Require defendant Nichols to disgorge any ill-gotten gains, including prejudgment interest thereon.

### IV.

Require defendant Nichols to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), in an amount to be determined by the Court.

### V.

Grant such other and further relief as this Court deems necessary and appropriate.

Respectfully submitted,

Merri Jo Gillette PA Bar No. 37075
Christina E. Rainville, PA Bar No. 54571
Kingdon Kase, PA Bar No. 37952
Michael B. Novakovic, PA Bar No. 69491
William Song, PA Bar. No. 71529

Attorneys for Plaintiff:
**SECURITIES AND EXCHANGE COMMISSION**

Dated: February 17, 2004

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of February, a copy of the foregoing Complaint was served by overnight mail to:

> Dean A. Nichols
> c/o Carlos A Martir, Jr., Esquire
> 3-5 N. 2nd Street
> 3rd Floor
> Philadelphia, PA 19106

_____
Kingdon Kase
Counsel for Plaintiff:
U.S. Securities and Exchange Commission